**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| CLAUDIO RADOCCHIA,<br>Plaintiff,<br>vs.<br><br>CITY OF LOS ANGELES; et al.,<br>Defendants. | ) | CASE NO. CV 09-1680 SJO (RCx)<br><br>**STATEMENT OF FINDINGS AND CONCLUSIONS**<br><br>S. James Otero, U.S. District Judge |

## I. FACTUAL BACKGROUND:

On January 28, 2008, Sonia Powell went to pick up her daughter E.P. from preschool at the Neighborhood School. (Material Fact # 1 (hereinafter "MF#")). Mrs. Powell noticed something unusual. Her daughter was walking alone on the playground. (MF # 2). Mrs. Powell went to E.P.'s classroom to get her daughter's lunch box when Plaintiff Claudio Radocchia came up to her. (MF # 3). Mr. Radocchia began to repeat over and over again what good friends her daughter and C.S., another child in the school, were and that they should have a play date together. (MF # 4). Mrs. Powell said her daughter kept looking down. Mrs. Powell could tell that something was bothering E.P. (MF # 5). Later, when mother and daughter were alone, E.P. told her mother that Claudio showed her his penis. C.S. was with her when it happened. (MF # 6). E.P. also told her father that Mr. Radocchia showed her his penis. (MF # 7).

The next day, on Tuesday, January 29, 2008, Mrs. Powell went to the Neighborhood School to report what her daughter told her. (MF # 8). C.S.'s parents were called to come to the school that day as well. C.S.'s family was interviewed by LAPD Officer Antonioli at the school. (MF # 9). C.S. told Officer Antonioli that she and E.P. had gone to the bathroom together and that Claudio took her to get a blanket. (MF # 10). When C.S. was asked about the incident, she put her head into her mother's chest and said she wanted to ask Claudio a question. (MF # 11). C.S. became withdrawn during the interview. Her parents were concerned about her behavior during the interview. (MF # 12). Officer Antonioli summarized his initial investigation in an Investigation Report. (MF # 13). He recommended further investigation by detectives from the Los Angeles Police Department. C.S.'s mother was upset and confused because her daughter told her that Claudio had showed her his penis. (MF # 14).

On Wednesday, January 30, 2008, C.S. told her mother that Claudio had showed her his penis. (MF # 14) She further stated that Mr. Radocchia said "don't tell your mommy, daddy, grandma, or grandpa" because he would get into trouble. She also told them that Mr. Radocchia took her to the bathroom and wiped her vagina. (MF # 15).

Officer Antonioli's report was sent to detectives for further investigation. The report states that when Officer Antonioli interviewed E.P., E.P. said Radocchia showed her his penis. According to the report, E.P. was very clear when she made this statement. E.P. also confirmed that C.S. was with her. (MF # 16).

Defendant Detective Monica McPartland was assigned to investigate the allegations. Detective McPartland worked in the sexually exploited child unit. She had training through the FBI, the Department of Justice, and Stuart House on interviewing children suspected of being sexually abused. (MF # 17). Mrs. Powell first spoke with Detective McPartland approximately 3 to 4 days after informing the school of the incident on January 29, 2008 or around February 1st or 2nd, 2008. (MF # 18). Mrs. Powell sent a summary of the incident in an email to Detective McPartland on February 7, 2008. (MF # 19).

Around January 29, 2008, Mrs. Sundahl spoke telephonically with Detective McPartland and told her a summary of the incident as relayed to her by C.S.  Mrs. Sundahl summarized the incident in an email sent to Detective McPartland.  (MF # 20).  Mrs. Sundahl never informed Detective McPartland that the information she provided was false or that C.S. made the whole incident up.  (MF # 21).

Sometime between January 29 and February 6, 2008, Detective McPartland received a time line from Debbie Beydler, a teacher who co-taught with Mr. Radocchia at the Neighborhood School on January 28, 2008.  (MF # 22).  The time line states that at 2:15 p.m. E.P. asked to go to the bathroom.  Mr. Radocchia told her to take C.S. with her.  The two girls left for the bathroom.  At approximately 2:20 p.m., Mr. Radocchia said he needed to wash some paint cups in the outside sink.  He left the class room for approximately 8-9 minutes.  (MF # 23).  Ms. Beydler confirmed the two victims and Radocchia were out of her sight for part of this time.

The CATS Center at Northridge Hospital specializes in diagnosing and treating children suspected of being sexually abused.  (MF # 24).  CATS stands for Children Assault Treatment Services.  (MF # 25).  CATS is a facility where children of sex crimes and adult rape victims are treated by specially trained medical staff.  (MF # 26).

E.P. and C.S. were seen by registered nurse Mary Ann Lague on February 4, 2008.  (MF # 27).  Nurse Lague had extensive training in interviewing and examining child abuse victims.  (MF # 28)  Nurse Lague performed over 1100 exams of victims of sexual abuse.  (MF # 29).  In February 2008, Lague had conducted approximately 200 interviews of children under the age of five suspected of being sexually abused.  (MF # 30).

Detective McPartland attended the interviews of the children at CATS.  (MF # 31).  Detective McPartland spoke with Mary Ann Lague after E.P.'s interview.  (MF # 32)  An audiotape of the interview disclosed that Mr. Radocchia showed E.P. his penis.  (MF # 33).  McPartland did not hear that nurse Lague prompted E.P. to say things about the incident.  (MF # 34).  Nor did McPartland hear that E.P.'s family prompted her to

describe the incident with Mr. Radocchia. (MF # 35).

C.S. was interviewed two times at CATS. (MF # 36). The first interview was on February 4, 2008. The nurse was not able to get a lot of information from C.S. (MF # 37). On February 6, 2008, C.S. was interviewed again. She provided some information to the nurse. (MF # 38). C.S. never told the nurse that nothing happened. (MF # 39). McPartland watched the interview from another room. (MF # 40). Detective McPartland interviewed C.S. at CATS the same day and confirmed that she was fearful. (MF # 41). C.S. told Detective McPartland that she didn't want to talk about the thing with Claudio. (MF # 42). When C.S.'s parents would ask her questions after the interview, C.S. would just shut down. (MF # 43). In nurse Lague's experience, a child who withdraws from answering questions about an incident could be evidence that the incident occurred. (MF # 44).

On February 5, 2008, Detective McPartland spoke on the phone with Mr. Radocchia and asked him to come in for an interview. Mr. Radocchia came to the station for the interview on February 6, 2008. (MF # 47). Mr. Radocchia brought a tape recorder with him to the interview. (MF # 48). The interview was videotaped by McPartland. Mr. Radocchia was aware the interview was being videotaped. (MF # 49).

Mr. Radocchia was not given Miranda warnings because he was not in custody and was free to leave. (MF # 50). Mr. Radocchia said he had self-imposed rules about not being alone with children or engaging in conduct that could be construed as inappropriate. (MF # 51). However, when asked further questions, he changed his story. The rules were not self-imposed. The school asked him to follow them. (MF # 52). The interview lasted around thirty minutes or more. (MF # 53). Mr. Radocchia estimates the interview was more than fifteen minutes but less than two hours. (MF # 54). Mr. Radocchia states that he did not make any incriminating statements during his interview. (MF # 55). Mr. Radocchia was not told by McPartland that he was in custody before the interview started. However, he subjectively felt he was in custody once the door to the interview room shut. (MF # 56). He was not put in handcuffs before the interview or

otherwise physically forced to start the interview. (MF # 57).

McPartland decided to arrest Mr. Radocchia at the end of the interview. (MF # 58). The factors she considered were Officer Antonioli's initial report, her interviews of the children, the fact there was more than one victim, the statements of a co-teacher giving Mr. Radocchia the opportunity to commit the crime, the statements of the parents, the statement by the nurse at CATS, and Mr. Radocchia's answers during the interview. (MF # 59). McPartland shut off his recorder and then took him into custody. (MF # 60).

## II.   FINDINGS AND CONCLUSIONS:

### a.   Standards on a motion for summary judgment.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. Proc. 56(e)). To carry this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita EEC. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) [citations]. "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) [citations omitted].

### b.   First Cause of Action for Violation of 42 U.S.C. § 1983

Plaintiff's Fourth and Fourteenth Amendment claims for unreasonable seizure, denial of equal protection, violation of due process and malicious prosecution are dependent upon the lack of probable cause. Probable cause requires only a fair

probability or substantial chance of criminal activity[.]" United States v. Alaimalo, 313 F.3d 1188, 1193 (9th Cir. 2002). Under the totality of the circumstances, McPartland had probable cause on February 6, 2008, to arrest Mr. Radocchia for exposing his penis to one or both of the minor victims: Both victims reported the crime to their parent, E.P. on January 28, 2008, and C.S. on January 30, 2008. Their parent then transmitted that information to the police. E.P. confirmed the incident to Officer Antonioli, Detective McPartland and Nurse Lague. Both child victims confirmed they were with each other during the act, and both reported Plaintiff as exposing his penis to them, at their school, on January 28, 2008. C.S. advised her mother that Plaintiff warned C.S. not to say anything or she would get into trouble. Officer Antonioli forwarded his initial investigation to detectives for further investigation. Debbie Beydler, a co-teacher with Plaintiff, confirmed there was an opportunity for Plaintiff to have committed the act on January 28, 2008. Nurse Lague, who has significant experience with child victims of sexual assault, advised Detective McPartland that C.S.'s behavior warranted concern. Nurse Lague also expressed her opinion to McPartland that E.P. had been subjected to some act of misconduct.

Defendant McPartland had probable cause to arrest Plaintiff on February 6, 2008, irrespective of any personal views she had or expressed regarding male pre-school teachers. An arrest does not violate the Constitution when it is supported by probable cause regardless of the motivations of the arresting officers. Schertz v. Waupaca County, 875 F.2d 578, 582 (7th Cir. Wis. 1989); Whren v. United States, 517 U.S.806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)

Additionally, Detective McPartland is entitled to qualified immunity. The Court finds that the law was not clearly established at the time and under the circumstances that McPartland's arrest of Plaintiff would violate his rights under the Fourth and Fourteenth Amendments. See, Stoot v. City of Everett, 582 F.3d 910, 912 (9th Cir. 2009).

The Court also finds Plaintiff's Fifth Amendment claim fails. Plaintiff alleges he was taken into custody and interrogated without being given his Miranda rights. This

claim fails because a peace officer's failure to read Miranda warnings is not itself a violation of a person's constitutional rights.  See, Cal. Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1045 (9th Cir. 1999) (citing New York v. Quarles, 467 U.S. 649, 654 (1984)).  Mr. Radocchia was not required to be given Miranda warnings because he was not in custody and was free to leave.

Additionally, Plaintiff alleges that his Fifth Amendment rights were violated when Detective McPartland "repeatedly threatened [him] and attempted to coerce him into a confession even though she knew he was innocent," and that he "refused to confess to acts he did not commit." (SAC ¶¶ 31B-C).  The Supreme Court, however, has held that there is no Fifth Amendment violation where a person is subjective to a coercive interrogation "absent the use of the involuntary statements in a criminal case." Chavez v. Martinez, 538 U.S. 760, 769 (2003).  There is no evidence in the record that any involuntary statements were used in a criminal case.

As to Plaintiff's Monell claims against Defendants City of Los Angeles and Los Angeles Police Department, a municipality may not be held liable under 42 U.S.C. § 1983 where no injury or constitutional violation has occurred.  City of Los Angeles v. Heller, 475 U.S. 796, 799, 89 L.Ed.2d 806, 106 S.Ct. 1571 (1986).   As there was no underlying constitutional violation, there can be no municipal violation.

**c.   Second and Third Causes of Action for Conspiracy under 42 U.S.C. Section 1983, 1985, and 1986**

Plaintiff cannot prove a conspiracy under 42 U.S.C. § 1983 absent proof of an underlying constitutional violation. As set forth above, the Court finds there was probable cause to arrest Plaintiff.  The Court also finds no evidence in the record to support an agreement was reached between the Powells and Detective McPartland to violate Plaintiff's constitutional rights. See, Ward v. Equal Employment Opportunity Comm'n, 719 F.2d 311, 314 (9th Cir. 1983).

Similarly, Plaintiff's claims under 42 U.S.C. §§ 1985, 1985(3) and 1986 also fail because there is no evidence to support these claims and Plaintiff did not suffer any

constitutional violation.

**d. Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Fifteenth, and Sixteenth Causes of Action**

Plaintiff's claims under California law also fail as Detective McPartland had probable cause to arrest Plaintiff.

Moreover, Detective McPartland and the City of Los Angeles are protected by the immunity provided under California Government Code § 821.6. See also, Cal. Gov. Code § 815.2. Cal. Gov't Code § 821.6 provides immunity from liability based on the acts or omissions of investigating officers, "even if [the public employee] acts maliciously and without probable cause." County of Los Angeles v. Superior Court, 181Cal.App.4th 218, 229 (2009).

**III. DISPOSITION:**

In light of the above, the Court grants summary judgment in favor of Defendants City of Los Angeles, Los Angeles Police Department and Monica McPartland as to Plaintiff's First Cause of Action under 42 U.S.C. § 1983.

The Court further grants summary judgment in favor of Defendants City of Los Angeles, Los Angeles Police Department and Monica McPartland as to Plaintiff's Second and Third Causes of Action under 42 U.S.C. §§ 1985, 1985(3) and 1986.

Finally, the Court grants summary judgment in favor of Defendants City of Los Angeles, Los Angeles Police Department and Monica McPartland as to Plaintiff's state law claims as stated in the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Fifteenth, and Sixteenth Causes of Action in the operative complaint.

Each side to bear their own costs and fees.

DATED: 7/29/10

S. James Otero
United States District Judge

**PROOF OF SERVICE**

I, MARIA CRUZ declare as follows:

At the time of service I was over 18 years of age and not a party to this action. My business address is 200 N. Main Street, 600 City Hall East, Los Angeles, CA 90012, which is the County, City and State where this mailing occurred.

On July 27, 2010, I served the document(s) described

**NOTICE OF LODGING DEFENDANTS CITY OF LOS ANGELES, ET AL.'S [PROPOSED] STATEMENT OF FINDINGS AND CONCLUSIONS**

on all interested parties in this action:

| | |
|---|---|
| Steven L. Zelig, Esq.<br>Brentwood Legal Services, LLP<br>11661 San Vicente Boulevard, Ste. 1015<br>Los Angeles, CA 90049 | **Attorneys for plaintiff**<br>CLAUDIO RADOCCHIA<br>ph: (310) 442-6042<br>fx: (310) 442-6052<br>email: slzlaw@aol.com |

[ ] BY FACSIMILE TRANSMISSION TO:
(310) 442-6052; (924) 724-8504; (213) 337-1010

I transmitted such documents by fax to the office(s) of the addressee(s) via facsimile machine, prior to 5:00 p.m. on the date specified above. The facsimile machine I used was in compliance with Rule 2003(3) and the transmission was reported as complete without error. Pursuant to Rule 2008(e), I caused a copy of the transmission report to be properly issued by the transmitting facsimile machine.

[XX ] BY MAIL - I deposited said envelope(s) in the mail at Los Angeles, California, with first class postage thereon fully prepaid. I am readily familiar with the business practice for collection and processing of correspondence for mailing. Under that practice, it is deposited with the United States Postal Service on that same day, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one (1) day after the date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made. I declare under penalty of perjury under the laws of the states of the United States that the foregoing is true and correct.

Executed on July 27, 2010, at Los Angeles, California.

_______________________________
MARIA CRUZ